Catherine A. Laughner
M. Christy S. McCann
BROWNING, KALECZYC, BERRY & HOVEN, P.C.
801 W. Main, Suite 2A
Bozeman, Montana 59715
Telephone:  406.585.0888
Facsimile:  406.551.1059
Email:  cathyl@bkbh.com
        christy@bkbh.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| CALUMET MONTANA REFINING, LLC,<br><br>Plaintiff,<br><br>v.<br><br>HOLLYFRONTIER CORPORATION; HOLLY CORPORATION; MONTANA REFINING COMPANY, A PARTNERSHIP; BLACK EAGLE, INC.; NAVAJO NORTHERN, INC.; HOLLYFRONTIER REFINING & MARKETING LLC; AND DOE A,<br><br>Defendants. | Case No.<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Calumet Montana Refining, LLC ("CMR"), by and through its

counsel, Browning, Kaleczyc, Berry and Hoven, P.C., hereby files this Complaint

against Defendants HollyFrontier Corporation, Holly Corporation, Montana

1498572//2973.050

Refining Company, a partnership (MRC), Black Eagle, Inc., Navajo Northern, Inc., HollyFrontier Refining & Marketing LLC, and Doe A, and alleges as follows:

## <u>NATURE OF THE ACTION</u>

CMR brings this action to recover damages from HollyFrontier Corporation, Holly Corporation, Montana Refining Company, Black Eagle, Inc., Navajo Northern, Inc., HollyFrontier Refining & Marketing LLC, and Doe A (collectively referred to as "Holly" or "Defendants"). Through an Asset Purchase Agreement ("APA") dated in 2006, Defendants sold the assets of the refinery in Great Falls, Montana ("Refinery") to Plaintiff CMR. However, the APA did not transfer the environmental liability to CMR. Instead, pursuant to the APA, Defendants explicitly retained liabilities for environmental defects existing at the Refinery as of the acquisition date.

As of the date of the APA there were hazardous substances/constituents and environmental defects at the Refinery. CMR incurred cleanup costs, including Resource Conservation and Recovery Act ("RCRA," 42 U.S.C. §§ 6901, *et seq.*) Corrective Action costs, in removing historical contamination in the soil and ground water. Defendants have failed to remediate the environmental defects, or indemnify and reimburse CMR.

1498572//2973.050

CMR seeks reimbursement, recovery and contribution from the Defendants, under the 2006 APA, the Montana Comprehensive Environmental Cleanup and Responsibility Act ("CECRA"), Montana Code Annotated §§ 75-10-701, *et seq.*, and the federal Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601, *et seq.*  CMR requests damages for (1) Defendants' breach of the APA, (2) Defendants' failure to timely cleanup the hazardous substances/constituents at the Refinery, (3) Defendants' failure to reimburse and indemnify CMR pursuant to the APA, and (4) related tortious conduct.  In addition, CMR seeks punitive damages from Holly and a declaration that Defendants are jointly and severally liable for the past and future costs necessary to clean up contamination at the Refinery.

## PARTIES

1.      Plaintiff CMR is a Delaware company, with its principal office located in Indianapolis, Indiana. It is registered with the Montana Secretary of State and regularly transacts business in the State of Montana.

2.      The entities that sold the Refinery assets in 2006 -- Montana Refining Company, a Partnership ("MRC"), Black Eagle, Inc., and Navajo Northern, Inc. -- are subsidiaries of Holly Corporation.   After Holly Corporation merged with

3

Frontier Oil Corporation, the name of the merged company was changed to HollyFrontier Corporation.

3.      Defendant HollyFrontier Corporation is a Delaware corporation, transacting business in Montana. Defendant MRC is a Montana general partnership with its principal place of business in Texas.  Defendant Black Eagle, Inc. is a Delaware corporation, registered in the State of Montana with its principal place of business in Texas.  Defendant Navajo Northern, Inc. is a Nevada corporation with its principal place of business in Texas.  Defendant HollyFrontier Refining & Marketing LLC is a Delaware corporation, registered in the State of Montana, with its principal place of business in Texas.  Holly Corporation is not registered to do business in Montana but has transacted business in Montana and is subject to the jurisdiction of Montana courts.  *Simmons v. Holly Corporation*, 244 Mont. 75, 89, 796 P.2d 189, 197 (1990).

4.      Defendant Doe A is the entity to which MRC's and Holly Corporation's liability was transferred in the event Defendants deny liability transferred to HollyFrontier Corporation or HollyFrontier Refining & Marketing LLC.  CMR will seek leave to amend this Complaint and Jury Demand to state the true name of Doe A when the same has been ascertained.  CMR believes such entity, a corporation, partnership or other legal entity, is legally responsible for the

4

occurrences alleged herein and CMR's damages that were proximately caused by Defendants' unlawful acts or omissions.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this controversy pursuant to 42 U.S.C. § 9613(b), (h) and 28 U.S.C. § 1331.

6.      This Court also has subject matter jurisdiction under 28 U.S.C. § 1332, because the amount in controversy exceeds $75,000 and the parties are citizens of different states.

7.      This Court has supplemental jurisdiction over CMR's state law claims under 28 U.S.C. §1367(a) because those claims are so related to CMR's federal claims that they form part of the same case or controversy.

8.      Venue is proper in the District Court of Montana, Great Falls Division pursuant to 28 U.S.C. § 1391(b), 42 U.S.C. § 9613(b), Mont. Code Ann. § 25-2-123, and Local Rule 1.11 because the contamination or damages giving rise to the claims occurred within this district and the property that is the subject of this action is located in this district.

//

//

1498572//2973.050

## BACKGROUND

9.    CMR is the current owner of the assets of the Refinery, which is located in Great Falls, Montana between Smelter Avenue and the northern bank of the Missouri River.  A legal description is attached as Exhibit 1.

10.    CMR acquired the assets of the Refinery when Calumet Lubricants Co., Limited Partnership, purchased all of the stock of Montana Refining Company, Inc. (MRCI) and then converted that company into a limited liability company and changed the name to Calumet Montana Refining, LLC.   MRCI purchased the Refinery assets from Holly in 2006, pursuant to the APA.

11.    During its ownership of the Refinery, Defendants constructed a land treatment unit ("LTU") and disposed of hazardous waste and hazardous substances, slop oil, leaded tank bottoms, and ignitable wastes on Refinery property.  In 1995, the Montana Department of Environmental Quality ("MDEQ"), acting under the authority of the Montana Hazardous Waste Act and the federal RCRA, issued hazardous waste permit No. MTHWP-95-02 to Holly.

12.    In addition to the hazardous wastes placed in the LTU, Defendants contaminated soil and groundwater outside of the LTU.  In 1998, Holly disclosed to MDEQ a Current Conditions Report of the contaminated conditions at the Refinery. Holly recognized that RCRA Corrective Action would be required.

6

13.     EPA and MDEQ transmitted comments on Holly's Current Conditions Report May 7 and August 28, 1998.  The agencies' General Comment No. 2(c) noted that the Refinery is subject to the human health standards listed in DEQ Circular WQB-7 required by the Montana Water Act.  In Specific Comment No. 39, the agencies addressed historical soil and groundwater that had been released at the Refinery, stating:

> The list of SWMUs [Solid Waste Management Units] and AOCs [Areas of Contamination] that have released hydrocarbons to soil is incomplete.  Soil staining was noted in the RFA around many of the SWMUs and AOCs that is not described in the CCR [Current Conditions Report] text.

And,

> The last paragraph on page 2-20 states that MRC has not found any evidence to indicate a release to groundwater from soils. Groundwater has been impacted in the area of the gasoline and light oil loading rack (AOC#16).  An oil sheen was also noted on water in a test pit located downgradient of SWMU#9.  Contaminants were found in the EPA wells DH-1 and DH-2.  These data indicate that soil contamination has impacted groundwater at the MRC refinery.  The last sentence on page 2-20 should be deleted.  However, except for AOC #16 and AOC #26, it is probable that the source(s) of the releases to groundwater are as yet unknown.

14.     Holly initiated RCRA Corrective Action at the Refinery, and it was on-going prior to the assets being sold in 2006.  Holly disclosed in Schedule 11 of the APA that no agency had yet approved a plan for the RCRA Corrective Action, and it could take many years.  The APA provided that Holly would remain fully

7

liable and responsible for all Retained Environmental Liabilities, whether known at Closing or not.  RCRA Corrective Action is a Retained Environmental Liability. A copy of the APA is attached as Exhibit 2.

15.     Holly sold the assets of the Refinery in 2006, but the plain language of the APA demonstrates the existing environmental liability was not conveyed.

16.     In addition to Holly's retention of the existing environmental liability at the Refinery, the parties to the APA recognized that CMR as Buyer may take remediation actions pursuant to Environmental Law or lawful directive of a Governmental Entity (as those terms are defined in the APA).  The APA includes provisions laying out Defendants' obligations to compensate CMR for its costs to remediate or mitigate the existing environmental contamination (Section 9.3) and recognizing there will be ongoing RCRA Corrective Action (Section 9.4).  Holly disclosed in Schedule 11 of the APA that soil and groundwater were contaminated.

17.     Holly remains fully liable and responsible for all Retained Environmental Liabilities (as that term is defined in the APA), whether or not known at Closing.  Holly agreed to indemnify and hold harmless Buyer against and from all Losses, Liabilities, and Claims (as those terms are defined in the APA) of any nature suffered or incurred.

18.    In 2007, former-owner MRCI discovered lead contamination at the Refinery.  Lead previously had been used to treat gasoline at the Refinery in the "Doctor Treatment Process."  MRCI sent Holly letters dated May 10, 2007, and November 6, 2007, concerning lead discovered in the soil associated with the Doctor Treatment Process.  MRCI also sent these letters to MDEQ, and MDEQ required an investigation of the area within the Refinery where the Doctor Treatment Process had been conducted.

19.    Holly did not disclose the Doctor Treatment Process area, including its contamination, in the APA, although Holly was aware lead was used to treat gasoline at the Refinery in that area.  Subsequent investigation by CMR revealed 11.3% lead contamination in shallow soils at the Refinery.  Therefore, during Holly's operation of the Refinery, Holly exposed its employees to at least 11.3% lead contamination in the soil.  The 11.3% lead concentration is a potential source of contamination to the ground water and the Missouri River.

20.    On November 1, 2012, CMR met with Holly employees in Salt Lake City to discuss contamination at the Refinery.  Holly employee David Jelmini suggested that an annual general plan of action for Corrective Action activities with budgetary estimates be prepared.

1498572//2973.050

21.     In December 2012, as a follow-up the Salt Lake City meeting between CMR and Holly employees, CMR kept Holly informed of  the historical lead investigation and cleanup actions and re-sent the letters originally sent in 2007 to Holly employee Phil Youngblood, dated May 10, 2007 and November 6, 2007. CMR also forwarded the following correspondence with MDEQ to Holly:  12/5/06 MDEQ letter to D. Busby, 12/22/06 M. Krum letter to MDEQ, 12/29/06 MDEQ letter to D. Busby, 8/15/07 MDEQ letter to D. Busby,  8/10/11 M. Krum letter to MDEQ, 9/19/11 H. Bedbury email to MDEQ, 9/30/11 H. Bedbury letter to MDEQ, 12/7/11 MDEQ letter to H. Bedbury, 6/11/12 MDEQ email to S. Chouinard, 6/13/12 MDEQ email to S. Chouinard, 6/13/12 S. Chouinard letter to MDEQ, 12/12/12 MDEQ email to D. Busby, 6/14/12 MDEQ letter to S. Chouinard.

22.     As further follow-up to Holly's suggestion at the November 1, 2012 Salt Lake City meeting, CMR provided the requested plan of Corrective Action activities for 2013 and a cost estimate of $5.6 million to Holly on January 24, 2013. CMR explained that the lead in the Refinery soil is hazardous waste and excavation is proposed to protect industrial workers at the Refinery.  CMR further explained that the hazardous lead is a source of contamination to the ground water. CMR noted that it did not believe all of the work could be completed in 2013, and also alerted Holly that costs could be significantly more.

10

23.    Holly responded on February 4, 2013, requesting electronic copies of the "Current Conditions Report, Remedial Investigation, Corrective Measures Study"   However, it was Holly who had prepared these reports prior to the 2006 asset sale of the Refinery.  Holly also wrote CMR claiming that, "To the best of our knowledge, there is no evidence that the lead is mobile at this time."

24.    Holly did not eliminate exposure of the lead to Refinery workers, or reduce the lead source to groundwater and the Missouri River.

25.    On May 15, 2013, CMR wrote to Holly about upcoming work and forwarded MDEQ's letters dated February 27, 2013, April 4, 2013, and April 29, 2013 to Holly.  In those letters, MDEQ commented:

> CMR has asked if ground waters under the refinery are proven to be Class III ground water and the neighbors are industrial users does the remediation treatment change.  The numeric water quality standards of Circular DEQ-7 apply.  Pursuant to Administrative Rules of Montana (ARM) 17.30.1006(3)(b)(i), CMR may not cause a violation of the human health standards listed in DEQ-7 even if the ground water is Class III.  Therefore, DEQ will continue to use the standards in Circular DEQ-7 as the remediation standard for hazardous constituents in ground water that have been contaminated by activities at the CMR refinery.

26.    Holly responded to CMR on May 30, 2013 stating, "Concerning AOC's 24 and 25 [rail loading area and Old Ponded Area] we agree that the work you propose is required by the Montana DEQ and subject to reimbursement by the Seller.  We also recognize and appreciate your efforts to minimize costs.  Please

11

provide updated cost estimates as soon as they become available so that we might budget appropriately."

27.     On June 21, 2013, CMR wrote to Holly regarding additional lead investigations and forwarded MDEQ's June 14, 2013 letter.  CMR estimated that the investigation costs would exceed $250,000 in 2013.  On June 28, 2013, CMR provided Holly with the draft work plan for the investigation.   The work plan defined the proposed excavation area for the lead contamination, to a depth of 8 to 10 feet.

28.     Holly provided no response to CMR's June 21, 2013 letter.  Holly provided no comments to CMR or MDEQ on the June 28, 2013 draft work plan.

29.     On July 3, 2013, MDEQ approved the RFI Work Plan to investigate contaminated soil and groundwater at the Refinery.   On July 8, 2013, CMR sent by Federal Express MDEQ's approval letter to Holly employees Jelmini, Kachel, and Black Eagle General Counsel.

30.      Holly provided no response to MDEQ's July 3, 2013 approval.

31.      On July 17, 2013, CMR forwarded its estimated sampling costs to Holly.

32.     Holly provided no response to the sampling estimate sent July 17, 2013.

12

33.     On September 20, 2013, CMR wrote to Holly regarding discovery of additional buried wastes.

34.     Holly provided no response to the September 20, 2013, letter from CMR.

35.     On November 7, 2013, CMR forwarded a letter to MDEQ discussing excavation of AOC 25, the Old Ponded Area, to Holly.

36.     Holly provided no response to CMR's November 7, 2013 letter.

37.     On December 9, 2013, CMR provided the RFI Phase 1 Summary Report to Holly.   On December 16, 2013, CMR provided the November 2013 Interim Measures Monthly Report to Holly.

38.     Holly provided no response to CMR's December 9 or December 16, 2013 letters.

39.      On December 28, 2013, CMR wrote to HollyFrontier, Navajo Refining Company, LLC, and Black Eagle, LLC, forwarding MDEQ's December 19, 2013 letter requiring soil corrective action and groundwater sampling. MDEQ's letter stated, "Groundwater sampling results indicated exceedances of Montana water quality standard in Circular DEQ-7 values.  Many of the hazardous constituents found in soil above EPA RSLs were found in ground water above DEQ-7."

1498572//2973.050

40.    On January 13, 2014, CMR forwarded MDEQ's January 8, 2014 conditional approval of CMR's work plan to Holly.  MDEQ's January 8, 2014 letter explained that "Hazardous constituents from contaminated soils in the areas to be excavated are potentially contributing to the Circular DEQ-7 exceedances observed in groundwater at the site.  VOCs and SVOCs have been documented in four wells down gradient of the area to be excavated.  The levels of contamination are well above Circular DEQ-7 for some constituents.  For example, benzene in monitoring wells #19R, 39R, #14, and #48 was measured at 140, 2340, 2750, and 4780 ug/L respectively.  The benzene standard is 5 ug/L."

41.    In January 2014, Holly employee Holder informed CMR that Holly did not have enough information and suggested a meeting with CMR.  A meeting was held January 28 and 29, 2014.  Holder explained during the meeting he was in charge of a similar RCRA Corrective Action project at the Conoco refinery in Billings, where contaminated soil was excavated down to shale.  Holder further commented that a $400/ton disposal cost for hazardous soil would be a good rate.

42.    On February 20, 2014, CMR wrote to Holly employee Holder, Navajo Refining, and Black Eagle explaining its upcoming work, the reasons for undertaking the work, and explaining how costs have been mitigated.  CMR requested a response by February 27, 2014.

14

43.    Holly employee Holder wrote to CMR on February 27, 2014, stating he does not have sufficient information to conclude the proposed work is reimburseable under the APA.

44.    More than twelve months after CMR initially proposed its excavation soil plan to Holly on January 24, 2013, and five months after CMR submitted a draft work plan to Holly and MDEQ, Holly employee Holder wrote on April 1, 2014, that Holly had several concerns it wanted to discuss, and urged "hot spot" removal.  Holly requested additional meetings.

45.    On April 18, 2014, MDEQ confirmed to CMR, that:  (1) worker exposure levels for surface workers to 2 foot depth and for construction workers to 10 foot depth are not negotiable; (2) DEQ-7 are statewide groundwater quality levels that apply onsite as well as offsite.

46.    In June 2014, in an attempt to once again obtain reimbursement from Holly for costs associated with the investigation and clean up of historic lead contamination at the Refinery required by RCRA Corrective Action, which now exceeded $4,000,000, CMR wrote to Holly requesting payment on outstanding invoices.

47.    On January 12, 2015, CMR notified Holly of additional outstanding invoices totaling more than $8,000,000. At this time, CMR was due a total of over

1498572//2973.050

$12,000,000 by Holly for the investigation and clean up of historic lead contamination at the Refinery, pursuant to the APA.

48.    On February 13, 2015, as requested by Holly, CMR re-sent the outstanding invoices to Holly employee Holder with invoice summaries and backup documentation.

49.    On February 18, 2015, CMR and Holly, with its environmental consultant, participated in a meeting with MDEQ in Helena, Montana. During this meeting MDEQ emphasized its concern with lead-impacted groundwater compared to DEQ-7 standards.  MDEQ told Holly the importance of DEQ-7, specifically, that DEQ-7 is Montana law and the levels in DEQ-7 must be adhered to.  MDEQ also stated that the project must have a plan in place to reach DEQ-7 levels onsite as well as at property boundaries.

50.    On February 20, 2015, CMR re-sent additional outstanding invoices, invoice summaries, and backup documentation to Holly.

51.    Although Holly had reimbursed MRCI or CMR for eight invoices sent between 2007 and 2013 for historical contamination, Holly stopped paying any invoices completely in 2014.

52.    In 2007, CMR submitted Invoice #200704 to Holly for reimbursement of RCRA Corrective Action work.  Holly paid the invoice (without interest).  This

16

cost was for the excavation and offsite disposal of contaminated soils pursuant to a MDEQ approved work plan and was similar to work that Holly has refused to pay in 2014 and 2015.

53.    In 2008, CMR submitted Invoice #200801 to Holly for reimbursement of RCRA Corrective Action work.  Holly paid the invoice (except for interest and MRCI management expenses).

54.    In 2009, CMR submitted Invoice #200901 to Holly for reimbursement of RCRA Corrective Action work.  Holly paid the invoice.

55.    In 2011, CMR submitted Invoice #201101 to Holly for reimbursement of RCRA Corrective Action work.  Holly paid the invoice. This cost was for the excavation and offsite disposal of contaminated soils pursuant to a MDEQ-approved work plan and is similar to work that Holly has since refused to pay.

56.    In 2011, CMR submitted Invoice #201102 to Holly for reimbursement of RCRA Corrective Action work.  Holly paid the invoice.

57.    In 2011, CMR submitted Invoice #201103 to Holly for reimbursement of RCRA Corrective Action work.  Holly paid the invoice, but not the interest charged.

58.    In 2011, CMR submitted Invoice #2001104 to Holly for reimbursement of RCRA Corrective Action work.  Holly paid the invoice.

1498572//2973.050

59.     In 2012, CMR submitted Invoice #201201 to Holly for reimbursement of RCRA Corrective Action work.  Holly refused to pay the invoice.

60.     In 2013, CMR submitted Invoice #239269 to Holly for reimbursement of RCRA Corrective Action work.  Holly paid the invoice.

61.     In 2014, CMR submitted Invoice #361910 to Holly for reimbursement of RCRA Corrective Action work.  Holly paid part of this invoice.

62.     In 2014, CMR submitted Invoices #387149, 447742, 474187, 503755, 533065, 556924, 578331 to Holly for reimbursement of RCRA Corrective Action work.  Holly has not paid these invoices.

63.     In 2014, CMR submitted Invoice #447742 to Holly for reimbursement of RCRA Corrective Action work.  Holly has not paid this invoice.

64.     By paying for soil excavation, removal, and disposal costs for contamination prior to 2013, Holly led CMR to reasonably believe it would continue to pay for excavation and removal costs.  CMR continued to investigate and remove contamination in 2013 and 2014 and continued to submit invoices to Holly, based on the reasonable belief that Holly would continue reimbursements and honor its obligation.

65.     Holly has failed to reimburse $14,388,422.28 in unpaid invoices from CMR's investigation and removal of contaminated soil and groundwater that

18

existed at the time of the 2006 APA.  CMR's work was done pursuant to MDEQ-approved work plans.  This historical contamination, subject to RCRA Corrective Action, was known to Holly at the time of the 2006 asset sale.

66.    Defendants participated in the management and exercised control over the Refinery.  Defendants were actively involved in Refinery activities.

67.    Defendants owned and operated the Refinery at the time hazardous substances were released.

## COUNT I:
## BREACH OF CONTRACT

68.    Plaintiff incorporates the foregoing allegations of this Complaint as if set forth in full.

69.    Defendants entered into the APA on March 2, 2006 with MRCI, which was converted to CMR.

70.    Pursuant to the APA, Defendants remained fully liable and responsible for all "Retained Environmental Liabilities," whether known at Closing or not, and were obligated to jointly and severally indemnify and hold harmless CMR against and from all Losses, Liabilities, and Claims of any nature in connection therewith.

71.    Plaintiff has incurred costs remediating soil and groundwater contamination that Defendants disclosed in Schedule 11 of the 2006 APA.

19

Remediation also occurred on contamination Defendants did not disclose. CMR conducted the remediation pursuant to plans approved by the MDEQ.

72.    The remediation of soil and groundwater contamination that was identified as a result of on-going RCRA remediation was required by MDEQ. The associated costs were therefore incurred as a result of a "Third Party Claim" under the APA.

73.    Defendants are required to indemnify Plaintiff for those costs pursuant to the APA, and they have failed to do so, thereby breaching the APA.

74.    As a result of these breaches of the APA, Plaintiff suffered damages, the nature and amount of which shall be proven at trial.

## COUNT II:
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

75.    Plaintiff incorporates the foregoing allegations of this Complaint as if set forth in full.

76.    Defendants had an obligation to Plaintiff to conduct themselves with honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade.

77.    By failing to abide by the terms of the contract, Defendants acted outside of accepted commercial practices to deprive Plaintiff of the benefit of the APA.

78.    Defendants breached the covenant of good faith and fair dealing by acting dishonestly, deceitfully, and unreasonably to deny Plaintiff the benefit of the

1498572//2973.050

APA and to deny Plaintiff's justifiable expectations that Defendants would act honestly and reasonably in the performance of the contract.

79.     Defendants have deprived CMR of the benefits of the APA, including, without limitation, the Indemnity Clause related to Retained Environmental Liabilities, by withholding reimbursement for the cleanup, removal, and disposal costs associated with historical soil and groundwater contamination.

80.     Defendants' breach of the implied covenant of good faith and fair dealing has caused Plaintiff damages in an amount to be proven at trial.

## COUNT III:
## NEGLIGENT MISREPRESENTATION

81.     Plaintiff incorporates the foregoing allegations of this Complaint as if set forth in full.

82.     Defendants negligently made representations as to an existing material fact when Defendants failed to identify and disclose the Doctor Treatment process area to CMR as an environmental liability under the APA or otherwise, when Defendants knew or should have known that area was contaminated by lead.

83.     Defendants negligently made representations as to an existing material fact when Defendants stated in early 2015 they would pay CMR for undisputed costs related to MDEQ-approved Corrective Action.

84.     Defendants' representations were made without any reasonable ground for believing them to be true, and were made in an attempt to prevent

1498572//2973.050

liability for remediation costs, to induce Plaintiff to continue negotiations regarding on-going duties to indemnify Plaintiff for remediation costs, to defraud Plaintiff, and to prevent Plaintiff from taking legal action against Defendants.

85.     At the time these misrepresentations were made and the material facts not disclosed, and at the time the actions herein alleged were taken, Plaintiff was ignorant of the true facts.  If Plaintiff had known the true facts, it would not have acted as it did.

86.     Plaintiff reasonably relied on these representations, and its reliance was justified.

87.     As a direct result of Plaintiff's reliance on Defendants' representations, Plaintiff has suffered damages in an amount to be determined at trial.

## COUNT IV:
## ACTUAL FRAUD

88.     Plaintiff incorporates the foregoing allegations of this Complaint as if set forth in full.

89.     Defendants made a material omission when they failed to identify and disclose the Doctor Treatment process area as an environmental liability under the APA or otherwise, when Defendants knew of should have known that area was contaminated by lead.

22

90.     Defendants represented to Plaintiff they would pay the undisputed costs incurred by Plaintiff in remediation, and identified the undisputed costs they would pay.

91.     Defendants' representations and omissions were false in that Defendants knew or should have known the Doctor Treatment process area was contaminated by lead, and in that Defendants knew that they would not pay all undisputed costs and never intended to pay all undisputed costs.

92.     Defendants' representations and omissions were material in that they concerned Plaintiff's business.

93.     Defendants knew such representations and omissions were false as Defendants were or should have been fully aware that the Doctor Treatment process area was contaminated, and Defendants were fully aware that they never intended to pay all of the undisputed costs.

94.     Defendants failed to disclose to Plaintiff the true facts that the Doctor Treatment process area was contaminated and that Defendants actually and intentionally withheld payment of some undisputed costs in an effort to gain leverage.

1498572//2973.050

95.     Defendants intended for Plaintiff to rely on the misrepresentations in an effort to induce Plaintiff to give up its rights in negotiations and to prevent Plaintiff from taking legal action against Defendants.

96.     Defendants' actual fraud and misleading statements were intended to deceive Plaintiff for the benefit of Defendants.

97.     Plaintiff was unaware Defendants' representations and omissions were false.

98.     Plaintiff justifiably relied on Defendants' representations and omissions as Plaintiff reasonably believed Defendants disclose known contamination and would pay the undisputed costs as they agreed.

99.     As a direct and proximate cause of Defendants' fraudulent conduct, Plaintiff has been damaged in an amount to be proven at trial.

100.    Defendants' conduct has been malicious, fraudulent, oppressive, and done with conscious or intentional disregard for Plaintiff's substantial rights and the high probability of injury to Plaintiff.  Defendants should therefore be punished for their actions and conduct and an example should be made thereof to discourage and deter Defendants and others from engaging in such outrageous and injurious conduct in the future.  Therefore, Plaintiffs are entitled to an award of punitive damages in a just and reasonable amount to be determined at trial.

## COUNT V:
## CONSTRUCTIVE FRAUD

101.   Plaintiff incorporates the foregoing allegations of this Complaint as if set forth in full.

102.   Defendants had a duty to act in good faith and deal fairly when identifying and disclosing all areas within the Refinery that were contaminated.

103.   Defendants had a duty to act in good faith and deal fairly when representing they would pay all of the undisputed costs related to remediation.

104.   Defendants representations or omissions regarding the contamination in the Doctor Treatment process area caused prejudice to Plaintiff.

105.   Defendants' representations that they could and would pay all undisputed costs related to remediation coupled with their subsequent failure to do so caused prejudice to Plaintiff.

106.   As a result of Defendants' constructive fraud, Plaintiff has suffered damages in an amount to be proven at trial.

//

//

//

1498572//2973.050

## COUNT VI:
## NEGLIGENCE

107.   Plaintiff incorporates the foregoing allegations of this Complaint as if set forth in full.

108.   Defendants had a duty to act with reasonable care, so as not to jeopardize Plaintiff's property and Plaintiff's use and enjoyment thereof.

109.   Defendants also had a duty to investigate and remediate any contamination, including violations of Montana DEQ-7 in the groundwater that did occur on the Refinery property in a timely and effective manner pursuant to RCRA and Montana regulations.

110.   Defendants breached their duties to Plaintiff by failing to investigate and remediate the contaminants located on Refinery property in a timely and effective manner.

111.   As a direct result of Defendants' breach, Plaintiff has suffered damages in an amount to be proven at trial.

## COUNT VII:
## NUISANCE

112.   Plaintiff incorporates the foregoing allegations of this Complaint as if set forth in full.

26

113.   Plaintiff has ownership and/or a proprietary interest in certain real and personal property in the areas affected by the spread and migration of contamination released by Defendants' operations on-site at the Refinery.  Plaintiff also has the right to the exclusive use and quiet enjoyment of its property.

114.   Defendants' conduct constitutes a nuisance in that it has caused substantial injury to and interference with the comfortable use by Plaintiff of its real and personal property and its right to use its property in the customary manner without exposure to or concern regarding the dangers of hazardous and/or toxic chemicals and substances.

115.   Unless the nuisance is abated, Plaintiff's property and its right to use and enjoy its property will be progressively and further damaged, and its interests will be further jeopardized.

116.   As a direct result of the nuisance created by Defendants, Plaintiff's property has been unlawfully invaded by Defendants' hazardous contamination, and Plaintiff has sustained damages in an amount to be proven at trial.

## COUNT VIII:
## PUNITIVE DAMAGES

117.   Plaintiff incorporates the foregoing allegations of this Complaint as if set forth in full.

27

118.   As alleged herein, Defendants had knowledge of facts or intentionally disregarded facts that created a high probability of injury to Plaintiff, and: (1) deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to Plaintiff; or (2) deliberately proceeded to act with indifference to the high probability of injury to Plaintiff.

119.   Defendants' conduct constitutes actual malice as defined in Mont. Code Ann. § 27-1-221(2).

120.   As alleged herein, Defendants made representations with knowledge of their falsity or concealed material facts from Plaintiff with the purpose of depriving Plaintiff of its property or legal rights or otherwise causing injury to Plaintiff.  Plaintiff had a right to rely on the representations of Defendants and suffered injury as a result of such reliance.

121.   Defendants' conduct constitutes actual fraud as defined in Mont. Code Ann. § 27-1-221(3), (4).

122.   Defendants should be punished for their actions and conduct and an example should be made thereof to discourage and deter Defendants and others from engaging in such outrageous and injurious conduct in the future.  Therefore, Plaintiff is entitled to an award of punitive damages in a just and reasonable amount to be determined at trial.

1498572//2973.050

## COUNT IX:
## CONTRIBUTION UNDER FEDERAL CERCLA, 42 U.S.C. § 9613

123.   Plaintiff incorporates the foregoing allegations of this Complaint as if set forth in full.

124.   Plaintiff is a "person" as defined in 42 U.S.C. § 9601(21).

125.   Plaintiff has paid more than its equitable share of response costs at the Refinery and is entitled to contribution from Defendants pursuant to 42 U.S.C. § 9613(f) for an equitable share (all or some portion) of the response costs incurred, or to be incurred, as a consequence of the release or threatened release of hazardous substances into the environment at the Refinery, including prejudgment interest.

126.   Upon filing this Complaint, Plaintiff provided a copy of this Complaint to the Attorney General of the United States and to the Administrator of the Environmental Protection Agency pursuant to 42 U.S.C. § 9613(l).

## COUNT X:
## CONTRIBUTION AND DECLARATORY RELIEF UNDER CECRA, MONT. CODE ANN. § 75-10-724

127.   Plaintiff incorporates the foregoing allegations of this Complaint as if set forth in full.

29

128.   The Refinery is a "facility" as that term is defined in Mont. Code Ann. § 75-10-701(4).

129.   Defendants are "person(s)" as that term is defined in Mont. Code Ann. § 75-10-701(16).

130.   The contaminants in and around the Refinery, including but not limited to the lead found in the former Doctor Treatment area, qualify as "hazardous or deleterious substance[s]" under Mont. Code Ann. § 75-10-701(8).

131.   Plaintiff is being held jointly and severally liable for costs of cleanup of the contamination at the Refinery by MDEQ under Mont. Code Ann. § 75-10-715.

132.   Defendants owned and operated the Refinery at the time hazardous substances were released or disposed of at the Refinery.  Thus, Defendants are jointly and severally liable for remedial action costs pursuant to Mont. Code Ann. § 75-10-715.

133.   Plaintiff has paid and will continue to pay more than its equitable share of response costs at the Refinery and is entitled to contribution from Defendants and a declaration as to Defendants' liability pursuant to Mont. Code Ann. § 75-10724, for an equitable allocation (all or some portion) of the response costs incurred, or to be incurred, as a consequence of the release or threatened

30

release of hazardous or deleterious substances into the environment at the Refinery.

## COUNT XI:
## DECLARATORY JUDGMENT

134.   Plaintiff incorporates the foregoing allegations of this Complaint as if set forth in full.

135.   Pursuant to 28 U.S.C. § 2201, this Court may declare the rights and other legal relations of any interested parties seeking declaratory relief whether or not such relief is or could be sought.

136.   The Refinery is a "facility" as defined in 42 U.S.C. § 9601(9) and Mont. Code Ann. § 75-10-701(4).

137.   Hazardous wastes and substances have been released into the environment at the Refinery within the meaning of 42 U.S.C. § 9601(22) and Mont. Code Ann. § 75-10-701(3).

138.   Defendants were persons who owned or operated the Refinery at the time of the release or disposal of hazardous substances at the Refinery, or otherwise caused or exacerbated the release of hazardous substances at the Refinery.

139.   Plaintiff has incurred remediation costs to respond to the release of hazardous substances at the Refinery, and these costs were reasonable, consistent,

1498572//2973.050

and in substantial compliance with the National Contingency Plan, 40 C.F.R. § 300.

140.   Pursuant to 28 U.S.C. § 2201 and Mont. Code Ann. § 75-10-724, Plaintiff is entitled to a declaration under 42 U.S.C. § 9613(g)(2) that is binding as to any subsequent action or actions.  Such judgment shall declare that Defendants are liable to Plaintiff for any and all costs, damages, and liability that Plaintiff may incur as a result of releases or threatened releases of hazardous substances at and from the Refinery.

141.   Plaintiff also is entitled to a declaration pursuant to Mont. Code Ann. §§ 27-8-101, *et seq.*, regarding Defendants' obligations to indemnify Plaintiff pursuant to the terms of the APA.  Plaintiff continues to incur costs arising from the remediation of soil and groundwater contamination identified as a result of on-going RCRA remediation as required by MDEQ.

142.   Under Montana law, Plaintiff is entitled to reimbursement and indemnification for those remediation costs identified as a result of the on-going RCRA remediation and required by MDEQ.

143.   By acting in the manner alleged above, Defendants have violated and continue to violate the implied covenant of good faith and fair dealing due Plaintiff, to its financial detriment.

1498572//2973.050

144.   Defendants' actions are in breach of the terms of the APA.

145.   Plaintiff therefore asks the Court to declare that under federal law, Montana law, and the plain language of the APA, Plaintiff is entitled to reimbursement and indemnification for past, present, and future remediation costs that fall under the terms and plain language of the APA.

## DEMAND FOR TRIAL BY JURY

146.   Plaintiff hereby demands trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, CMR prays for judgment against Defendants as follows:

a.  For damages from Defendants' breach of Contract plus interest as permitted by law;

b.  For damages arising from Defendants' tortious conduct;

c.  For indemnification in accordance with the APA, and applicable law;

d.  For restoration damages;

e.  For punitive and exemplary damages;

f.  For Plaintiff's costs and disbursements as permitted by law;

g.  For attorneys' fees and costs as permitted by law; and

h.  Such other and further relief as the court deems just and equitable.

33

DATED this 22nd day of September, 2015.

BROWNING, KALECZYC, BERRY & HOVEN, P.C.

By */s/ M. Christy S. McCann*
    M. Christy S. McCann

Attorneys for Plaintiff